IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MARK WAYNE MOORE, JR. | CASE NO. 1:25-cv-1156 |
| Plaintiff, | DISTRICT JUDGE JOHN R. ADAMS |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Mark Wayne Moore Jr. filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying his applications for child's disability benefits and supplemental security income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural Background**

In August 2021 and October 2023, Moore filed applications for supplemental security income and child's insurance benefits, respectively,

1

alleging a disability onset date of March 1, 2014.[1] Tr. 175, 184, 236.[2] Moore alleged disability due to learning difficulties, emotional disorder, and mild "MR." Tr. 210. The Commissioner denied Moore's application initially and on reconsideration. *See* Tr. 109, 121.

In October 2023, Moore requested a hearing. Tr. 125. Administrative Law Judge ("ALJ") Penny Loucas held a telephonic hearing in May 2024. Tr. 46. Moore appeared, testified, and was represented by counsel at the hearing. *Id.* Qualified vocational expert Lauren Petkoff also testified. *Id.* Later in May 2024, the ALJ issued a written decision, which found that Moore was not entitled to benefits. Tr. 14.

In July 2024, Moore appealed the ALJ's decision to the Appeals Counsel. Tr. 171. In April 2025, the Appeals Counsel denied Moore's appeal, Tr. 1, making the ALJ's April 2024 decision the final decision of the Commissioner. Tr. 14–45; *see* 20 C.F.R. § 404.981.

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2]     Moore's opening brief alleges a disability onset date of March 1, 2014, and supports this date with a citation to three pages in the administrative record. *See* Doc. 7 (citing Tr. 89, 175, 184). Of the pages Moore cites, only Tr. 89 and 184, which pertain to Moore's child's insurance benefits application, indicate an onset date of March 1, 2014. By contrast, Moore's application for supplemental security income alleges that "[m]y disability began on September 1, 2018." Tr. 175. Neither party, nor the ALJ, remark on this discrepancy and all describe that Moore's disability began in March 2014. So I have included a disability onset date of March 1, 2014.

**Evidence**[3]

*Personal, Educational, Vocational*

Moore was born in 1996 making him 17 years old as of the alleged onset date. Tr. 175. He completed high school. Tr. 211.

*Medical Evidence*

The ALJ summarized the undisputed medical evidence as follows:

> The record supports that the claimant has experienced functional limitations related to BIF, intellectual disability, ADHD, MDD, mood disorder, and anxiety disorder.
>
> For the period March 1, 2014, through March 1, 2018, the record contains the following remarkable education and medical records:
>
> The claimant's education records indicate that he was on an Individualized Education Program (IEP), but he was dismissed from speech and language services based on his progress in these areas. In his 12th grade Evaluation Team Report (ETR) (B2F/16-46 (12/10/14)), his behavior assessments indicated low scores in learning problems, interpersonal difficulties, inappropriate behavior, and unhappiness/depression; he had difficulty communicating and regulating his emotions (B2F/26-27). In testing dated November 6, 2014, the claimant had a full-scale IQ score of 77, a performance IQ score of 79, and a verbal IQ score of 78 (B2F/29 (11/06/14)).
>
> Additional testing showed he was functioning at an elementary school level in all measured areas (B2F/30 (11/12/14)). His 12th grade IEP indicated that he was social and outgoing with peers and with supervisors at work sites; he had positive behavior

---

[3]     The recitation of evidence and testimony is not intended to be exhaustive and is generally limited to the evidence relevant to the parties' arguments.

and was attentive; and he worked best in environments that were predictable and routine and where he could receive one-to-one attention. He became distracted and off task around others, and he had periods of time where he would engage in work refusal, ignoring requests of others, shutting down, and being physical or aggressive with other students in the classroom. He received specially designed instruction in vocational reading and math, and behavior, in a resource classroom weekly. He also had a paraprofessional aide for support for art classes, lunch, and on the bus. His accommodations included extra time, breaks, opportunities for movement, repeat directions, and assignment modifications. He was not excused from the Ohio Graduation Test and did not participate in alternate assessments (B2F/2-15 (12th grade IEP effective 12/10/14-12/09/15)).

In August of 2017, the claimant attended a physical examination with his sister. On examination, his judgment and insight were intact; and his mood and affect were normal (B1F/4- 6 (08/04/17)). At a consultative psychological examination on January 3, 2018, the claimant reported caring for his sister's young children for several hours each day. On examination, he was well-groomed, at ease, and cooperative; his eye contact was good; his intelligence was assessed as lower than average; he had no abnormal motor activity; his speech was unremarkable; he was calm and established easy rapport; he was not paranoid, did not make delusional statements, and there was no indication of overt psychosis; he was alert and oriented times three; he could not spell "world" either forward or backward; he could not perform basic mathematical calculations; his immediate, short, and long-term memory recall for three items was perfect; and his insight was fair (B4F/3-5).

After this period, the record does not contain evidence that the claimant received specialized mental health treatment between the time of his graduation from high school and 2021. Rather, it

4

shows that beginning in September of 2021, the claimant underwent individual counseling, and beginning in November of 2022, he received psychiatric medication management, as well (see B11F/152-235 (09/21/21-11/29/22)). The undersigned notes that the claimant underwent psychological testing on May 8, 2019, where his full-scale IQ score was 75, his performance IQ score was 80, and his verbal IQ score was 74. He also underwent an achievement test, which showed the claimant's reading to be at about a fourth-grade level. He was assessed with anxiety disorder, and BIF (B13E/62-64 and B5F/3-4 (05/28/19)).

For the period beginning October 17, 2023, there are some remarkable findings relating to the claimant's concentration and mood, but his examinations were otherwise unremarkable. His remarkable psychiatric/mental status examination findings and reports include the following: At a counseling session in October of 2023, the claimant reported his medication was working well, his mood was improving, and his ADHD medication was helping. On examination, he was engaged; his appearance was appropriate; his behavior was cooperative; his speech was monosyllabic; his mood was nervous and anxious, and his affect was appropriate for the circumstances; he had depressive cognitions; and his insight and judgment were appropriate (B11F/47-9 (10/16/23)). At a psychiatric medication management appointment later that month, he reported doing "pretty good;" on examination, his appearance was neat; his eye contact was good, and he was cooperative; his motor activity was restless; his speech was rapid; his affect was full range, and his reported mood was depressed, anxious, and worried; he had depressive cognitions and racing thoughts; he was distracted; and his insight and judgment were poor (B11F/40-46 (10/25/23)). At counseling a few days later, his mood was nervous/anxious, and he had depressive cognitions, but the rest of his examination was unremarkable (B11F/37-39 (10/30/23)).

5

In November of 2023, the claimant reported having a migraine; his counseling notes indicate his appearance was disheveled, and he had depressive cognitions, but his examination was otherwise unremarkable (B11F/34-36 (11/08/23)). A few weeks later, he was relaxed, engaged, and cooperative; his speech was monosyllabic; and his examination was otherwise unremarkable (B11F/31-33 (11/22/23)). At counseling in early December, his speech was rapid; his mood was nervous/anxious; and he had depressive cognitions (B11F/28-30 (12/06/23)). At a physical examination that month, he was alert and oriented times three; his mood and affect were within normal limits; and his insight and judgment were intact (B8F/6-8 (12/19/23)). At his next counseling session, he was engaged and made good eye contact; he had depressive cognitions, but his examination was otherwise unremarkable (B11F/25-27 (12/20/23)).

At counseling in January of 2024, he reported having been sick and not having taken his ADHD medication for a few days, and on examination, he was disheveled; his mood was nervous and anxious, and the rest of his examination was unremarkable (B11F/22-24 (01/03/24)). At a medication management appointment the next day, his appearance was neat; his eye contact was good; his motor activity was restless; his speech was rapid; his affect was full range; his mood was depressed, anxious, and worried; he had depressive cognitions and racing thoughts; he was distracted, but cooperative; and his insight and judgment were poor (B11F/16-21 (01/04/24)).

At counseling in mid-January of 2024, his examination was unremarkable (B11F/13-15 (01/17/24)). At the end of the month, his speech was rapid, and he had depressive cognitions, but his examination was otherwise unremarkable (B11F/10-12 (01/31/24)).

At counseling in February of 2024, he was engaged; his appearance was appropriate; his speech was

unremarkable; his mood was neutral and his affect was appropriate; he had depressive cognitions; and his insight and judgment were appropriate (B11F/7-9 (02/14/24)). At his medication management examination, which he attended with his stepmother, his appearance was neat; his eye contact was good; his motor activity was restless; his speech was rapid; his affect was full range; his mood was depressed, anxious, and worried; he had depressive cognitions and racing thoughts; he was distracted; he was cooperative; and his insight and judgment were poor. His mood disorder and ADHD were assessed as improving, and his medication regimen was continued (B12F/3-7 (02/29/24)). The undersigned notes that all the examination findings at the claimant's medication management appointments were identical, and in each of them, he is "improving" as to his mood disorder and "improved on medication" as to his ADHD (B11F/4, 19, 45).

At counseling in April of 2024, the claimant reported some depression after a friend passed away; on examination, his appearance was appropriate; his behavior was cooperative; his speech was unremarkable; his mood was neutral; his affect was appropriate for the circumstances; and his insight and judgment were appropriate (B12F/1-2 (04/09/24)).

Tr. 31–33.

*Vocational Expert Testimony*

Qualified vocational expert Lauren Petkoff testified, in relevant part, regarding whether jobs exist in the national economy for a hypothetical individual with Moore's RFC, age, education and work experience. *See* Tr. 40, 58–9. Ms. Petkoff also discussed what it meant, to her understanding, to require "supported employment services" and the possible effect if an employee

needed accommodations or engaged in certain conduct during that employee's
probationary period. Tr. 60–66.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1.     Born on March 2, 1996, the claimant had not
> attained age 22 as of March 1, 2014, the alleged
> onset date (20 CFR 404.102(c)(4) and 404.350(a)(5)).
>
> 2.     The claimant has not engaged in substantial
> gainful activity since March 1, 2014, the alleged
> onset date (20CFR 404.1571 et seq., and 416.971 et
> seq.).
>
> 3.     The claimant has the following severe
> impairments: borderline intellectual functioning
> (BIF); intellectual disability; attention-deficit
> hyperactivity disorder (ADHD); major depressive
> disorder (MDD); mood disorder; and anxiety
> disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.     The claimant does not have an impairment or
> combination of impairments that meets or medically
> equals the severity of one of the listed impairments
> in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
> 404.1520(d),     404.1525,     404.1526,     416.920(d),
> 416.925 and 416.926).
>
> 5.     After careful consideration of the entire
> record, the undersigned finds that the claimant has
> the residual functional capacity to perform a full
> range of work at all exertional levels but with the
> following nonexertional limitations: can understand,
> remember, and apply information to complete
> simple instructions; can maintain concentration,
> persistence, and pace for work tasks that are routine
> in nature and do not require hourly production
> quotas; can avoid hazards and make simple plans;
> and can interact with others so long as work does not
> require arbitrating conflicts between parties or
> directing the work of others.

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 2, 1996, and was 18 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2014, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g), and 416.920(g)).

Tr. 20–41.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

9

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

§ 1382c(a)(3)(A).

An ALJ is required to follow a five-step, sequential analysis to make a

disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d

417, 422 (6th Cir. 2008); *see also* Social Security Ruling 11-2p, 2011 WL

4055665, at *3 (Sept. 12, 2011) (setting out the same five-step analysis for cases

involving "young adults"). Under this sequential analysis, the claimant has the

burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden

shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. at 103 (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir.

2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

### Discussion

Moore presents one issue statement in support of his appeal:

> The ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly evaluate whether Plaintiff maintained the capability to perform and sustain work during the probationary period.

Doc. 9, at 8. At the outset, the Court notes that that Moore attempts to present multiple other arguments under this single-issue, one argument heading. Moore's attempt to brief multiple issues and subparts under a single heading is not only ineffective it contravenes this Court's initial order. Doc. 5, at 3 ("Each introductory heading in the Argument or Analysis section of a brief must correspond to the argument presented under the heading. Failure to comply with this requirement may result in (a) waiver of the arguments in the heading and in the text following the heading; (b) striking of the offending brief; and (c) other appropriate sanctions. Similarly, bald assertions of error— those unsupported by explanation and argument—will be deemed waived.").

12

As a sanction for this approach to briefing, the Court could strike all portions of Moore's arguments that are not clearly contemplated by his argument heading.[4]

Turning to Moore's overarching argument, Moore argues that the ALJ erred because she "failed to evaluate whether [Moore] is capable of sustaining work during [a] probationary period." Doc. 9, at 9.[5] Relevant to this argument, in August 2019, an entity called Opportunities for Ohioans with Disabilities provided Moore with an individualized plan for employment. *See* Tr. 315–19. The plan included the following question and answer:

> What is the projected need for Supported Employment Services?
> None are anticipated at the is time.

*Id*. at 316. It also included the statement that:

> We agreed that job coaching will help you transition back into employment, especially as you begin a new job. You will be working closely with a supervisor/trainer for the first few weeks and a job coach can assist with your early training.

*Id*. at 317.

---

[4]     Should Moore's counsel continue to employ this approach in future briefs, the Court may determine that any argument not properly raised is forfeited.

[5]     In this report and recommendation, the Court refers to the CM/ECF-generated page numbers at the top of the parties' filings.

In July 2019, Moore met at a local library with Randi J. Elder, who completed a vocational evaluation.[6] *See* Tr. 329–59. In a resulting supplemental vocational evaluation report, Elder stated that given Moore's "very limited work experience," she recommended the use of a "job coach … to assure a smooth transition into the work force." Tr. 358.

Without citing the record, Moore asserts that the vocational expert testified that the need for a job coach during a probationary period would be work preclusive.[7] Doc. 9, at 8–9. From this, Moore concludes that the ALJ erred by not including in the RFC the need for a job coach during a probationary period. *Id*. at 10.

There are a few problems with this line of argument, starting with the fact that Moore omits its factual basis—Elder's evaluation and recommendation—from his recitation of the facts. The Court may thus disregard Elder's evaluation. *See* Doc. 5, at 3–4. And without Elder's evaluation, Moore's argument lacks an essential premise.

Further, even putting aside this omission aside, Moore ignores the fact, noted by the ALJ, that his individualized plan for employment concluded that he did *not* need supportive employment services. Tr. 40, 316. Indeed, Elder's

---

[6]    In the record, Elder's name is followed by the following credentials: "M.A., M.Ed., C.R.C., C.C.M., LP.C." Tr. 359.

[7]    Although Moore cites page 59 of the transcript at the beginning of the paragraph containing this assertion, the relevant testimony is found at page 63.

comment that "job coaching will help [Moore] transition back into employment," is simply a truism. But the fact that job coaching would help does not mean that, contrary to Moore individualized employment plan, Moore requires it to work.[8]

Finally, the basis for Elder's recommendation that Moore use a job coach was not a physical or mental limitation, but the fact that Moore had "very limited work experience." Tr. 358.

In the end, the ALJ's decision is supported by substantial evidence and Moore's own briefing shows that the ALJ considered and weighed the evidence Moore references. *See* Doc. 9, at 12–13 (citing for example Dr. Rindsberg and Nurse Colucci's opinions and citing the ALJ's discussion of the same). Additionally, the ALJ explicitly stated that she considered the entirety of the record in reaching her decision. *See e.g.*, Doc. 7, at 29. And the fact that Moore can cite other evidence in the record which may, in his view, support a different outcome is irrelevant to this Court's inquiry. The ALJ, not Moore or this Court, is solely responsible for weighing the evidence. *See* 20 C.F.R. § 404.1520c(a) (explaining how *the ALJ* will consider and weigh medical opinions and prior administrative medical findings); *see also Rottmann v. Comm'r of Soc. Sec.*, 817

---

[8]     Notably, ALJs "may rationally rely on specific imperatives regarding a claimant's limitations, rather than recommendations." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). Elder's recommendation is self-evidently not stated in mandatory terms.

F. App'x 192, 196 (6th Cir. 2020)) ("this court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job.").

Oddly enough, Moore provides nothing to support his claim that the ALJ's decision "is not supported by substantial evidence" or that the ALJ failed to consider the evidence. And this matters because "so long as substantial evidence supports the conclusion reached by the ALJ" it doesn't matter that Moore can show substantial evidence also supports his position. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). To succeed on a substantial evidence argument, Moore must show the ALJ's decision is unsupported by substantial evidence, not that his position is supported. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Moore has failed to do so. His sole argument thus fails.

Additionally, while it is clear that Moore believes the ALJ should have provided a limitation for job-coaching support during the probationary period, it is not clear why Moore believes that a failure to include this limitation could support remand in his circumstances. Moore claims that "the ALJ failed to properly evaluate whether [he] maintained the capability to perform and sustain work during the probationary period," *see* Doc. 9, at 8, but fails to explain what evaluative process the ALJ failed to conduct.

In his opening brief, Moore focuses on a portion of vocational expert Petkoff's comments made during her testimony. *See* Doc. 9, at 9 (stating that "[t]he VE testified that an individual who required supported employment

16

services would need a job coach or special accommodations in order to perform work" and that "any type of accommodation would be work preclusive."). In his reply, Moore asserts that because he "required a job coach to successfully transition to new employment, he was not capable of competitive employment under the Agency's regulations." *See* Doc. 13, at 1 (citing Doc. 9, at 7–12). Moore, however, does not provide a citation to support his assertion that he *required a job coach* and the record belies his premise. *See* Tr. 40, 316.

In fact, Petkoff's testimony does not support Moore's premise. Her statement that an individual who required supported employment services would need a job coach or special accommodations in order to perform work, came in response to the ALJ's question regarding Moore's individualized plan for employment. Again, that document stated that Moore did *not* need any "supported employment services" at that time. *See* Tr. 40. The following discussion occurred during Petkoff's testimony:

> Q Ms. Petkoff, are you familiar with the Bureau of Vocational Rehabilitation Services and the services that they provide?
>
> A Yes. According to my CV, I have experience working for that agency through a contract.
>
> Q Okay, so I'm going to ask you some questions about some of the terminology and the things that I saw in the claimant's BVR records. What does it mean when they say projected need for supported employment services? That's at Exhibit B13 Page 7. I know that you don't have access to B13. Maybe it's 13E. Yeah, it's 13E. Yeah, do you know what that means?

17

A So Supported Employment Services, that was something that was developing more and more as I was actually transitioning out of the system. But to my recollection, it's basically Supported Employment Services means that the individual may require like the use of a job coach or special accommodations in order to perform work.

Q Okay, so I'm looking at Page 7. I got that from Page 7. When completing the job search on Indeed.com using zip code for this area, 14 jobs were generated, okay? What is the projected need for Supported Employment Services? They say none are anticipated at this time. *So that means that they didn't anticipate back then that he would need Supported Employment Services even for the 14 jobs they appeared to have identified back then. Is that how I can interpret that? Is that a fair interpretation?*

*A Yes, that would be my interpretation as well.*

Q Okay.

Tr. 58–59 (emphasis added).

Moore's specific contention—that the ALJ failed to properly evaluate Moore's ability to work during the probationary period—arises out of a line of inquiry initiated by Moore's attorney, during which the ALJ interjected to explain the agency's policy regarding evaluation of probationary periods:

Q Okay, so if an individual required that type of job coaching accommodation that you mentioned even short term or the beginning stage of the job, would that type of necessary support be work preclusive in competitive employment?

A Oh, goodness. So this is a difficult question to answer and I may be over-analyzing that question because the idea of having that job coach initially for

18

the first maybe two to four weeks is to maybe you know, help the individual learn that job maybe or perform or learn how to perform the job tasks in a different way. I mean, there's a multitude of reasons why the job coach may be necessary but the idea behind that kind of the job coach is so that the individual can transition into that competitive job. So from a BVR to OOD standpoint, that individual hopefully after the 90 days no longer needs a job coach and you know, they can remain at that competitive job. But I also understand too from a Social Security perspective any type of accommodations you know, could render the individual work preclusive. So I guess if we're strictly looking at it from a Social Security perspective, I guess any type of accommodation would be work preclusive.

ALJ: Well, and then at this point I do need to interject that the policy, this question about 90 days and what kind of assistance or modifications are needed during the probationary period. Policy is that whenever you are a vocational expert or even a hypothetical, it's addressing that period of time after the initial 90-day probationary period. Whatever accommodations or limits are part of that 90-day period to help the person learn is not a part of the policy consideration in assessing whether or not the person could continue on a fulltime basis and maintain competitiveness. So you know, that I think kind of addresses where you and or Mr. Bloom are addressing. You know, well if you can't get through the 90 days without some assistance well, that's not really a part of the policy. The policy is you know, after that 90 days. The question is as to whether or not the person can sustain work is after that 90-day probationary period. It doesn't apply for what is going on during or prior to the 90-day period being complete.

ATTY: I would object to that interpretation, Your Honor. I think that's incorrect.

ALJ: That's fine.

ATTY: Yeah.

ALJ: You can go ahead and object and it's so noted.

Q So going back to Ms. Petkoff so if an individual in competitive employment, someone had 30 days to learn a job or whatever. You know, it's an unskilled job as you listed those jobs in response to the Judge's first hypothetical. Those jobs, if a person showed up and said I need a job coach to be here, would that preclude those jobs?

A I feel like -- I'm so sorry, I don't know if I can answer that question.

Q Yeah. Well, so if the -- I'm sorry, can you tell me the jobs you identified in the response to the Judge's hypothetical one more time? I didn't write them down, I'm sorry.

A That's okay. Cleaner II, a store's laborer, and linen room attendant.

Q Okay, so if a person shows up to the linen room attendant job and then they're unable to do the job without the job coach being involved for the first 30 days, would they be fired?

A Well, I guess I'm in an interesting predicament because I'm kind of caught in the middle between interpretations here. But you know, if the individual is still able to maintain that competitive job after 90 days after needing that job coach, then it wouldn't be work preclusive.

Q But from a vocational expert standpoint having placed people in jobs, not coached them in the jobs but you've placed them in jobs, and they're there and they can't do it in the first two weeks because they

20

> need additional support to learn how to do the job.
> To understand the job and without the additional
> support, then they just aren't doing it right, right?
> Or aren't doing it at all and so surely an employer
> would just fire someone if they can't do the job that
> they hired them to do, right?
>
> A If the hypothetical individual is not meeting
> employer expectations within that probationary
> period, that individual can be met with reprimand
> up to and including termination.

Tr. 62–65.

As this excerpt illustrates, Moore's argument is a red herring because
he has not established his premise that he required a job coach during a
probationary period. At most, he's raised the possibility that a job coach would
be helpful. And his argument extrapolates on his disagreement with the ALJ's
explanation of agency policy during the hearing. *See* Doc. 9, at 11–12. But the
ALJ explained that she considered and rejected Moore's earlier arguments, *see*
Tr. 30, and Moore has not pointed to any binding authority that contradicts
the ALJ's explanation regarding her consideration of an employee's needs
during probationary periods, *see* Tr. 40. Instead, Moore explains that he
"disagrees" with the policy cited by the ALJ. Doc. 9, at 10. To the extent that
Moore *disagrees* with the Commissioner's policy on considering probationary
periods and the potential effect of an individual's need for assistance during
the probationary period—which, as noted, the record shows Moore did not
require—his disagreement without more is not basis to remand.

Additionally, the cases on which Moore relies, concerned claimants who, unlike Moore, were found to be incapable of completing a probationary period. *See* Doc. 9, at 10 (citing cases in which individuals were found unable to complete a probationary period of employment). So Moore's argument does not provide a basis for remand.

Moore presents several additional arguments, none of which are properly presented. *See* Doc. 5, at 3. But construing them as supporting Moore's main argument, they fail. The fact Dr. Rindberg's or Nurse Colucci's opinions could support an alleged need for a job coach during a probationary period, Doc. 9, at 12–13, is irrelevant given the absence of evidence that Moore required a coach. And the fact that the record could support a different conclusion does mean that substantial evidence does not support the ALJ's determination.

Finally, Moore's argument that the ALJ erred at step five when she failed to explain why a job coach would not be required, *id.* at 14, fails at the threshold because Moore hasn't shown that a job coach would be required.

**Conclusion**

For all of the reasons stated, I recommend that the ALJ's decision be affirmed.

Dated: February 6, 2026                    */s/ James E. Grimes Jr.*
                                           James E Grimes Jr.
                                           United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).